**WORCESTER COUNTY TRUST CO. v. UNITED STATES.**

No. 276.

District Court, D. Massachusetts.

Dec. 10, 1940.

Merrill S. June and Bradley B. Gilman, both of Worcester, Mass., for plaintiff.

Edmund J. Brandon, U. S. Atty., and C. Keefe Hurley, Asst. U. S. Atty., both of Boston, Mass., Samuel O. Clark, Jr., Asst. Atty. Gen., and Andrew D. Sharpe, and James P. Garland, Sp. Assts. to Atty. Gen., for defendant.

McLELLAN, District Judge.

This action is for the recovery of a portion of the federal estate taxes paid by the plaintiff as executor of the will of Erwin E. Aldrich.

The case was heard upon an agreed statement of some of the facts, and upon documentary and oral evidence.

The only real controversy between the parties is whether gifts by the decedent of the total approximate value of $105,000 were made in contemplation of death within the meaning of Section 302 of the Revenue Act of 1926, as amended by Section 803(a) of the Revenue Act of 1932, 26 U. S.C.A. Int.Rev.Acts, page 228, reading in part as follows:

"The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated—

\* \* \* \* \* \*

"(c) To the extent of any interest therein of which the decedent has at any time made a transfer, by trust or otherwise, in contemplation of or intended to take effect in possession or enjoyment at or after his death, \* \* \*".

### Findings of Fact.

On the basis of agreed facts, the documentary evidence, and such of the testimony as I believe accurate, I find as follows:

The decedent, Erwin E. Aldrich, being about 80 years of age in December, 1935, was born in about the year 1855. He was a deaf mute and unmarried. As early as 1919, when he was about 64 years of age, he had an irregular heart, some congestive failure, and began to take digitalis intermittently on the advice of his physician.

Thus early, also, he had an edema, or swelling, of the legs (stenographic record, page 39, near bottom). This was due to his then heart trouble. The decedent was nevertheless then and for years thereafter able to do from time to time such chores as raking leaves and caring for a furnace. The credible evidence was that Mr. Aldrich's heart condition was no indication that death was rapidly approaching, where, as was the case, he responded quickly to treatment and rest, and I so find as of the year 1919. It is not easy upon the evidence to determine exactly how the decedent's heart trouble developed during the next seven or eight years. It did, however, persist, and become gradually worse. His physician, having been asked to explain Mr. Aldrich's heart condition prior to 1927, answered, and I find, that "He had an arteriosclerotic heart disease with irregular pulse, and at times would have congestive failure, that is, when the heart would not quite do its work, and I would give him the heart medicine and the diuretics, and he would clear up each time, and he went along year after year, as some of them do, with a gradual—gradually failing heart muscle that responded well to the digitalis and diuretics * * *."

From time to time during the eight or ten years before 1927, the decedent was treated sometimes for heart disease and other times for coughs, colds, and bowel upsets. His physician, called on behalf of the plaintiff, testified in redirect examination in substance that during these years there was no severe heart condition, and that it became severe during the last three or four years prior to his death, which occurred in 1935. But whatever is meant by the term "severe" as here used, the facts as frankly disclosed by the physician when his recollection was refreshed are that he had a disease of the heart so serious as to be accompanied by shortness of breath, swelling of the legs, and necessity for digitalis and rest.

Having traced the decedent's medical history as disclosed by such portions of the evidence as I accept as accurate, and before reaching the month of September, 1927, it seems desirable to go back some years and indicate the decedent's mode of life and his relationship to the natural objects of his bounty.

In 1913, the decedent went to live in Worcester with his sister, Mrs. Hattie B. Metcalfe, where he paid for his room, board, laundry, and attentive care the sum of $6 a week. So far as his health permitted, he did some work about the place, such as caring for the furnace and the raking of leaves, and in the earlier years the care of some chickens. Such work as the decedent did, especially after 1919, when his heart disease had been discovered, plus the $6 a week, was insufficient compensation for all that he received by way of necessities and luxuries. For all that he received, he ought to have been, and I infer and find that he was, grateful.

The plaintiff's brief urges that "On all the evidence, the motive for the 1927 gift was the payment of Aldrich's obligation to his sister for her care of him since 1915." I am not satisfied upon the evidence and the reasonable inferences therefrom that such was even one of the motives for the decedent's gifts to his nieces and nephew. I find it was not a dominant or primary motive therefor. The dominant motive was far otherwise.

We approach the time of the gifts. In September, 1927, the decedent's physician attended him five times, not for a cold or a cough, but for a heart failure accompanied by swollen legs and shortness of breath (stenographic record, pp. 34 and 35). From this the decedent rallied. How soon thereafter he gave thought to the gifts I do not know. At any rate, it was as soon as November 9 of the same year. On that day George Avery White, Esquire, now president of the Worcester County Trust Company, but then a lawyer practising in Worcester, was called to see Mrs. Gladys M. Metcalfe, wife of a nephew of the decedent, and Mr. Charles A. Barton, vice president of the Worcester County Trust Company. Mrs. Metcalfe was then acting for the decedent, and any evidence to the contrary notwithstanding, I am certain that she asked Mr. White to prepare not only certain instruments of transfer and a codicil to the decedent's will, but also the declarations of trust hereafter described. This view is confirmed by Mr. White's notes taken at that time, and by his testimony given after refreshing his recollection therefrom. Mr. White's notes from which he refreshed his recollection read: "Allen Robert and R. Louise to execute an agreemnet with Trust Company to hold securities with power to hold without liability and pay income during life of Erwin E. Aldrich to him, and at his death to owner of securities, and to then turn

over property to owner or estate of owner — irrevocable until death of Erwin E. Aldrich."

In the plaintiff's brief the following appears: "At the close of the trial the Court indicated that a finding would be made that the decedent, when making the three gifts, knew that the three trusts would be executed by his nieces and nephew. * * We believe a correct finding would be that the nieces and nephews agreed with each other before the gifts that the trusts would be established but that Aldrich knew nothing of the trusts until after the gifts. Mr. Barton and Mr. White knew of the proposed trusts but Aldrich did not."

I can make no such finding. To put it cautiously, the plaintiff has failed to show by the greater weight of the credible evidence that the decedent did not then understand that he was to have an equitable life estate in the income from the property which he gave to his two nieces and his nephew.

As early as the next day after Mr. White's interview with Mrs. Metcalfe and Mr. Barton, namely, on November 10, 1927, Mr. White prepared instruments of transfer, in one of which the decedent's niece, R. Louise Metcalfe, was the donee, and in another a niece, Alice M. Swift, was the donee, and in the third his nephew, Robert D. Metcalfe, was the donee. Each instrument purported to transfer securities of the approximate value of $35,000. Typical of these instruments is the first one, reading in part:

"I Erwin E. Aldrich, desiring to benefit my niece, R. Louise Metcalfe, now residing in New York City, hereby give and transfer to her the following securities owned by me, possession of which securities has been this day delivered to my said niece. In making this gift I make it as an outright and unconditional gift for the reason that I have property which yields me an income largely in excess of my needs, and I desire my said niece to have and enjoy this property during my lifetime instead of waiting for it until after my decease:—"

■ .I have already found that I do not believe that the decedent was kept in ignorance of the proposed trusts, and so I do not believe that the donor's purpose was to permit the donees to have and enjoy the property transferred during his lifetime instead of waiting for it until after his death. In passing it may be added that the same idea expressed in the instruments of transfer appears in United States v. Wells, 283 U.S. 102, at page 118, 51 S.Ct. 446, at page 452, 75 L.Ed. 867, where the court said: "It is common knowledge that a frequent inducement [for a gift inter vivos] is not only the desire to be relieved of responsibilities, but to have children, or others who may be the appropriate objects of the donor's bounty, independently established with competencies of their own, without being compelled to await the death of the donor and without particular consideration of that event."

On November 10, Mr. White had also prepared a codicil to the decedent's will which purported to bequeath $35,000 to a nephew and a like amount to a niece who then received no gifts from the decedent. Whether Mr. White had then also prepared the trust instruments is a matter of considerable doubt, when one stops to consider the imperfections of human memory and the lapse of time between the events here considered and the time when the trial occurred.

I am able to make no affirmative finding as to precisely when the trust instruments were in fact prepared, except to say that it was either on the 10th·or the 11th of November. On November 10, 1927, the decedent, accompanied by his niece, R. Louise Metcalfe, went to Mr. White's office and there the decedent was introduced to Mr. White. The decedent then conferred in writing with Mr. White. Notes of the interview were received in evidence as plaintiff's Exhibit 3, and recite in question and answer form that the decedent had there the securities he wished to give away, that the value of each set of securities was $35,000, that the gifts were intended to be outright, that a paper presented to him was the codicil to his will, which he would like to have witnessed, that he intended at once to transfer some securities to his two nieces and his nephew, that the instrument drawn for such purpose was in accordance with his wishes, that the statements regarding the outright gifts which he intended to make at that time were as he wished them, and that he was making the gifts and the codicil voluntarily and that no one was urging him to do so.

Exhibit 3 contains no reference to any trust instruments, but as heretofore stated, I cannot on all the evidence find that such trusts were not contemplated as part of this same transaction. On this 10th day

of November, 1927, the decedent executed the instruments of transfer and the codicils to his will. On that day or the next the donees turned over the securities which they had received from the decedent to the Worcester Bank and Trust Company (now the Worcester County Trust Company), and declarations of trust dated November 11, 1927, were executed on behalf of the trustee by the same Mr. Barton who was present at the interview on November 9 heretofore described. Each of the three trust instruments provided for an equitable life estate in the income of the property in question, and in each instance the beneficiary of the three trusts signed an acceptance of the provisions of the trust instrument. I find as a fact that the instruments of transfer, the codicil to the will, and the trusts were all parts of a single plan, and that in spite of the purpose expressed in the instruments of transfer, the decedent's motive was not to permit his two nieces and nephew to enjoy the property during his lifetime "instead of waiting for it until after his decease."

The decedent, never having recovered from heart disease, lived for about eight years and died in December, 1935. As heretofore stated, all things have occurred entitling the plaintiff to recover from the defendant $10,908.29 with interest according to law if the transaction heretofore described did not constitute a transfer in contemplation of death, and entitling the defendant to judgment if such transfer was made in contemplation of death.

Upon all the evidence, I find further as a fact that the transfers here in question were made in contemplation of death within the meaning of Section 302 of the Revenue Act of 1926, as amended by Section 803 of the Revenue Act of 1932.

### Conclusions of Law.

In view of the foregoing findings, especially the ultimate finding that the transfers here in question were made in contemplation of death, it follows that the property given away is to be regarded as part of the decedent's effects for estate tax purposes. In view of this ultimate finding and the other findings, I should add that in making them I have recognized the duty of rejecting some of the evidence as inaccurate. This is not because the witnesses did not ordinarily try to state the facts as they are, but in part because human memory of events long past is sometimes frail, and recollections of honest men, refreshed by contemporaneous memoranda, may be trusted more readily than such as are not thus aided.

Having found that the gifts were made in contemplation of death within the "meaning of Section 302 of the Revenue Act of 1926, as amended by Section 803 of the Revenue Act of 1932", something may now be said as to the meaning I gave it before making the finding. Before doing so, it seems almost unnecessary to call attention to the fact that the gifts were made before the law was changed, which now makes property given away, but in which the donor retains an interest, taxable as part of his estate. This portion of the statute is not retroactive and not applicable. Hassett v. Welch, 303 U.S. 303, 58 S.Ct. 559, 82 L.Ed. 858.

The fact that in the case at bar the decedent retained a life interest in the income of the property is, however, one of the circumstances to be taken into consideration, and in a case less clear than this, might, in connection with other circumstances, be determinative of the question whether a transfer was made in contemplation of death. In the case at bar, this circumstance, though considered, is not regarded as decisive. Had the decedent's gifts been separable from the codicil and the trusts, the similitude to the effect of a testamentary disposition would have been lessened, but there would have remained cogent reasons for believing that the transfers were made in contemplation of death. As to the moral obligation owing from the decedent to his sister, I have found affirmatively that this did not constitute a dominant motive for the transfer to the decedent's nieces and nephew. Though in the light of this finding the observation may seem immaterial, I may say that such a motive, however compelling, would not in my judgment be inconsistent with the decedent's having chosen a transfer in contemplation of death as a method of yielding to such a motive. In short, such motives, one to satisfy a moral obligation, the other in contemplation of death, however strong each may be, are not exclusive of each other, either as to their existence or their strength.

Be this as it may, the fact, as heretofore found, is that the decedent's gratitude to his sister was, to say the least, not a dominant motive for the gifts made and the trusts created.

The meaning I gave to the phrase "contemplation of death" before finding ultimately that the transfers here in question were so made, is the meaning taught by United States v. Wells, 283 U.S. 102, 51 S.Ct. 446, 75 L.Ed. 867. It is my understanding that the words "in contemplation of death" mean that the thought of death is the impelling and controlling cause of the transfers and that as stated in Article 16, Treasury Regulations 80 (1934), the phrases as used in the statute are not limited to contemplation of imminent death or to an apprehension that death is near at hand. In making the ultimate finding that the gifts were made "in contemplation of death" I also accepted as one of the guides that portion of the Regulation above cited which says, as in substance does the Wells case, that the motive which induces the transfer must be such as leads to testamentary disposition and that "a gift inter vivos springs from a motive essentially associated with life rather than with death is not made in contemplation of death."

Judgment is to be entered for the defendant, with costs.